UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| REBECCA AGOSTO VEGA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-30030-KAR |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION FOR AN ORDER
AFFIRMING THE COMMISSIONER'S DECISION
(Docket Nos. 15 & 21)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION AND PROCEDURAL HISTORY

Rebecca Agosto Vega ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner denying her application for Social

Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

Plaintiff applied for DIB and SSI on October 21, 2016 alleging a July 1, 2013 onset of disability

due to pure hypercholesterolemia, eye problems, scoliosis, keratoconus, and other hypoglycemia

(Administrative Record "A.R." at 244, 245, 547, 554).[2]  After a hearing on September 19, 2018,

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the court directs that Kilolo Kijakazi, Acting
Commissioner of the Social Security Administration ("Commissioner"), be substituted for
Andrew Saul.

[2] All citations to "A.R." refer to the administrative record, which appears on the docket of
this case as document 11. The page numbers were assigned by the SSA and appear in the
lower right-hand corner of each page.

the Administrative Law Judge ("ALJ") issued a fully favorable decision on November 30, 2018 (A.R. at 202, 299-309).  The Appeals Council reviewed the decision on its own motion and remanded the case to the ALJ on October 17, 2019 (A.R. at 313-317).  The ALJ held a second hearing on April 2, 2020, and found that Plaintiff was not disabled from July 1, 2013 through June 2, 2020, the date of the decision (A.R. at 67-104, 178).  The Appeals Council denied review on January 12, 2021 (A.R. at 1-9) and, thus, Plaintiff is entitled to judicial review.

Plaintiff seeks remand based on contentions that the ALJ erred by (1) changing the weight he afforded the consultative examiner's opinion between his 2018 decision and his 2020 decision, and (2) failing to support the 2020 Residual Functional Capacity ("RFC") assessment with substantial evidence.  Before the court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 15), and the Commissioner's motion for an order affirming her decision (Dkt. No. 21). The parties have consented to this court's jurisdiction (Dkt. No. 20).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons set forth below, the court DENIES Plaintiff's motion and ALLOWS the Commissioner's motion.

II.    LEGAL STANDARDS

A.    The Legal Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.  A claimant is disabled for purposes of DIB and SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when she

is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v),  416.920(a)(4)(i)-(v).  The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

3

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding her restrictions and limitations. *See Goodermote*, 690 F.2d at 7.

B.    Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court reviews questions of law *de novo*, *id.,* but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to

4

determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

III.   RELEVANT FACTUAL BACKGROUND

A.   Educational Background, Work History, and Daily Living Activities

Plaintiff was forty-one years old at the time of the second hearing in April 2020 (A.R. at 182).  She had three adult children and lived with her youngest son (A.R. at 208, 1264).  She did not speak English but could read and write in Spanish (A.R. at 207).  She had earned a GED (A.R. at 1264).  When Plaintiff worked as a security guard in Puerto Rico from 2011 to 2015, she sometimes supervised other employees (A.R. at 188, 565-66).  She moved to Massachusetts in 2016 (A.R. at 1098).

Plaintiff's January 2017 function report indicated that she cared for her son and her dog with help (A.R. at 636).  Her memory deficits required reminders to take her medication and to go to medical appointments (A.R. at 637, 639, 640).  She did not have difficulty following instructions that were written in Spanish and was able to follow spoken instructions "at that moment" but might not remember them an hour later (A.R. at 640).  She did not note any problems with concentration (A.R. at 640).

Seven months later, Plaintiff stated that she went to church every second Sunday (A.R. at 664).  She could dress, bathe, and take care of her hair but still needed reminders to take medication (A.R. at 661, 662).  In addition to memory deficits, she noted difficulty with concentrating, completing tasks, following written and spoken instructions, and handling stress (A.R. at 665, 666).

B.      Relevant Medical Records Submitted Prior to the First Hearing

Because Plaintiff's claims of error only relate to limitations arising from mental health impairments and the differences in the ALJ's treatment of those impairments in his 2018 and 2020 decisions, the court limits its review to the mental health treatment records.

1.      School Street Counseling Institute

When Plaintiff exhibited symptoms of depression at the Baystate Brightwood Health Center ("Brightwood") in February 2017, a psychologist referred her to the School Street Counseling Institute ("SSCI") for services (A.R. at 1173, 1175, 1483).  Maria Gutierrez completed a comprehensive assessment of Plaintiff on February 16, 2017 (A.R. at 1483).  In a mental status examination, Ms. Gutierrez noted that Plaintiff appeared neat and appropriately dressed, avoided eye contact, was cooperative, spoke clearly and softly, was in a depressed mood, and reported signs of appetite and sleep disturbances (A.R. at 1490-91).  Her perception, thought content and process, intellectual functioning, orientation, memory, insight, and judgment were within normal limits (A.R. at 1491).

Plaintiff reported a history of three suicide attempts since she was thirteen years old (A.R. at 1491).  She had received mental health treatment for depression in Puerto Rico, was prescribed Ambien for sleep and Sertraline (Zoloft) for depression but ran out of medication after she moved to Massachusetts in 2016 (A.R. at 1483, 1487, 1499).  She sought services at SSCI because she felt despondent, had been crying "like crazy," and stayed in bed all day (A.R. at 1483).  Plaintiff reported mental and emotional impacts from her physical conditions, which included fibromyalgia, asthma, hypoglycemia, scoliosis, convulsions, migraine headaches, and poor vision that required corneal transplants (A.R. at 1483, 1488, 1492).  She further noted a history of trauma:  the father of her children shot her during an argument in July 1994 and bullet

fragments remained in her neck (A.R. at 1488, 1489).  Ms. Gutierrez diagnosed Plaintiff with severe major depressive disorder, recurrent, without psychotic features (A.R. at 1493).  Plaintiff agreed to attend individual psychotherapy sessions once a week to learn coping skills with the goal of reducing her symptoms of depression and obtaining support (A.R. at 1493, 1494).  She also agreed to be evaluated for psychiatric medication (A.R. at 1494).

Abel Gonzalez Casals, M.D., conducted an initial psychiatric evaluation of Plaintiff on August 29, 2017 (A.R. at 1499).  Plaintiff's mental status examination was "unremarkable" (A.R. at 1504).  She presented as well-groomed and appropriately dressed.  She was calm and cooperative with normal speech and good eye contact.  Her thought process was linear, coherent, and goal oriented.  Her thought content was appropriate for context.  She denied suicidal or homicidal ideation, delusions or other psychotic content, and perceptual disturbances.  She was alert, oriented times three with cognition grossly intact, good judgment and impulse control, and "partial" insight (A.R. at 1503).

Plaintiff reported that she felt worthless, stayed in her room, had crying spells and frequent nightmares, and avoided crowds.  She was apprehensive about traveling to Florida and Puerto Rico the following week (A.R. at 1499).  Dr. Casals prescribed Duloxetine (Cymbalta) to treat Plaintiff's depression and anxiety and Zolpidem (Ambien) to help her sleep.  Dr. Casals recommended that she continue with psychotherapy (A.R. at 1504).

During Plaintiff's October 19, 2017, visit with Dr. Casals, she reported that Cymbalta relieved her symptoms.  Dr. Casals increased her dosage (A.R. at 1406).  On November 7, 2017, Dr. Casals reported that Plaintiff was complying with her medications and tolerating them well.  The dosages remained the same (A.R. at 1405).

At Plaintiff's December 7, 2017, visit with Dr. Casals, she was well-groomed, appropriately dressed, calm, and cooperative. The volume and rate of her speech were normal. She made good eye contact. She said her mood was not good. Her affect was constricted and tearful. Her thought process was linear, coherent, and goal oriented and her thought content was appropriate for context. She displayed partial insight and good judgment and impulse control. Plaintiff denied suicidal or homicidal ideation, delusions or other psychotic content, and perceptual disturbances (A.R. at 1403). Plaintiff reported an increase in depression due to multiple stressors including health problems and a conflict with her landlord, which required her to move to a new residence, but sharing her home with her son helped (A.R. at 1401). Dr. Casals continued her medications and dosages (A.R. at 1405).

On December 19, 2017, Plaintiff saw Dr. Casals for a medication review (A.R. at 1405, 1507). She was well-groomed, appropriately dressed, and cooperative. The rate and volume of her speech were normal. She made good eye contact. Her mood was so so and her affect was constricted and anxious. Her thought process was linear, coherent, and goal oriented and her thought content was appropriate for context. Plaintiff denied suicidal or homicidal ideation, delusions or other psychotic content, and perceptual disturbances. Her insight was fair and her judgment and impulse control were good (A.R. at 1509). Plaintiff reported an increase in anxiety caused by the ongoing conflict with her landlord and an upcoming court date (A.R. at 1507, 1511). There were no changes to her medications (A.R. at 1511).

The record of Plaintiff's January 30, 2018 visit to Dr. Casals indicated that she presented as well-groomed, dressed appropriately, calm, and cooperative with normal speech and good eye contact. She reported that her mood was so so (A.R. at 1518). Her affect was reactive. Her thought process was linear, coherent, and goal oriented and her thought content was appropriate

8

for context.  Plaintiff did not report suicidal or homicidal ideation, delusions or other psychotic content, or perceptual disturbances.  Her insight was fair and her judgment and impulse control were good (A.R. at 1525).  She was in "a lot of [physical] pain," but was planning to go to Puerto Rico in February for a vacation (A.R. at 1523).  Dr. Casals maintained her medications and dosages (A.R. at 1527).

Plaintiff next visited Dr. Casals on March 27, 2018 (A.R. at 1516).  Her appearance and speech were unremarkable.  She was calm, cooperative, and made good eye contact.  She reported that her mood was not good and Dr. Casals noted that her affect was constricted.  Her thought process was linear, coherent, and goal oriented and her thought content was appropriate for context.  She denied suicidal and homicidal ideation, delusions or other psychotic content, and perceptual disturbances.  Her insight was fair and her judgment and impulse control were good (A.R. at 1518).  Plaintiff reported that her trip to Puerto Rico was enjoyable but her anxiety and symptoms of depression increased when she returned to Massachusetts (A.R. at 1516, 1520).  Dr. Casals continued her medications and doses (A.R. at 1520).  On April 17, 2018, Dr. Casals noted an increase in Plaintiff's anxiety, impulsivity, and irritability due to psychosocial stressors and that she remained engaged in psychotherapy.  He prescribed Klonopin for her anxiety and irritability (A.R. at 1569).

Plaintiff's therapist, Ms. Gutierrez, completed a Transfer/Discharge Form on April 20, 2018 because Plaintiff was changing clinicians (A.R. at 1576, 1578).  Ms. Gutierrez noted that, during her time in therapy, Plaintiff learned to advocate for herself in order to get medical treatment for her physical conditions (A.R. at 1576).  On April 24, 2018, Ms. Gutierrez reported that Plaintiff had developed friendships with a few people with whom she socialized about three times a month (A.R. at 1573).

On May 24, 2018, Plaintiff reported no improvement in her anxiety symptoms (A.R. at 1569).  She lacked energy and motivation and mostly stayed in bed because her anxiety increased when she went outside or interacted with non-family members (A.R. at 1565).  She spent time with her children, who were supportive, and her dog (A.R. at 1565, 1569).  She was working with a new therapist (A.R. at 1569).  Dr. Casals indicated that her mental status was unchanged from her March 27th visit except that she described her mood as so so (A.R. at 1567).  Dr. Casals described her affect as reactive (A.R. at 1567).  He changed her Klonopin dosage (A.R. at 1569).

At her June 21, 2018, appointment with Dr. Casals, Plaintiff reported stable but dysthymic moods due to multiple health and psychosocial stressors with improved mood on some days (A.R. at 1558, 1562).  She joined a gym, was looking forward to moving, and was planning a Christmas vacation in Puerto Rico (A.R. at 1558).  Her mental status examination results had not changed since May (A.R. at 1560).  She found Klonopin to be effective (A.R. at 1562).

Plaintiff's August 2, 2018, report to Dr. Casals was more positive and optimistic (A.R. at 1552, 1556).  Plaintiff reported improved mood, appetite, and sleep and less anxiety (A.R. at 1552).  She was walking, going to a gym, and looking forward to celebrating her birthday in Puerto Rico in December (A.R. at 1552, 1556).  On mental status examination, Dr. Casals noted that her mood was ok and her affect was full range and reactive (A.R. at 1554).  He continued her medications and dosages (A.R. at 1556).

        2.     Brightwood Health Center, Worthington Clinic, Baystate Medical Center Emergency Department, and Baystate Neurology

10

On August 10, 2016, Plaintiff presented at the Baystate Medical Center ("BMC") emergency department with abdominal pain (A.R. at 1052). She was alert, cooperative, and oriented to person, place, time and situation (A.R. at 1053).

Plaintiff was transported to the BMC emergency department by ambulance on September 22, 2016 after suffering what appeared to be seizures (A.R. at 1101). When she was admitted, she was alert, awake, oriented x 3, and had an appropriate affect (A.R. at 1098, 1099). The neurological examination showed that her mental status was intact and there were no language or cognitive deficits (A.R. at 1095, 1124).

On October 4, 2016, Plaintiff completed a PHQ-9 depression screening during her first visit to Brightwood (A.R. at 1186, 1190). She reported a lack of interest and depression for several days during the past two weeks, altered sleep and appetite and a lack of energy nearly every day for two weeks, and difficulty concentrating for more than half the days during the two-week period (A.R. at 1186). Upon examination by Lynn A. Minnick, N.P., Plaintiff was alert, oriented x 3, in no acute distress, and appeared teary. Plaintiff's PHQ-9 score of 15 indicated a moderate level of depression. N.P. Minnick referred her for a mental health evaluation and diagnosis (A.R. at 1192). On February 1, 2017, when Plaintiff reported uncontrolled depression and low back pain, N.P. Minnick referred her to SSCI (A.R. at 1173, 1175). Plaintiff's PHQ-9 depression screening score was 20, indicating severe depression, when she visited Brightwood on February 23, 2017 (A.R. at 1179).

On April 13, 2017, Plaintiff reported to N.P. Minnick that she was not sleeping, cried every day, and felt sad, lonely, and depressed. Plaintiff presented N.P. Minnick with a letter from her therapist at SSCI, Ms. Gutierrez, asking a Brightwood physician to prescribe the

medications Plaintiff had been prescribed in Puerto Rico because she would have to wait months for a psychological evaluation at SSCI (A.R. at 1229).

Plaintiff established care with Katherine Krauskopf, M.D., at the Worthington Clinic on July 27, 2017 (A.R. at 1341).  Plaintiff was easy to engage, made good eye contact, and was anxious during the visit (A.R. at 1341).  On August 11, 2017, Dr. Krauskopf found Plaintiff to be a bit tangential but redirectable, anxious, dysthymic, and tearful when discussing her history of being a victim of domestic violence and her present concerns (A.R. at 1345).  On September 1, 2017, Dr. Krauskopf indicated that Plaintiff was easy to engage, made good eye contact, and was anxious (A.R. at 1347).  Dr. Krauskopf noted that Plaintiff was a bit restricted during her visit on October 6, 2017 but was easy to engage and made good eye contact (A.R. at 1349).  On November 3, 2017, although Plaintiff reported concerns about her housing, Dr. Krauskopf recorded her improved affect (A.R. at 1352).  On January 5, 2018, Plaintiff told Dr. Krauskopf that her mood was more or less stable (A.R. at 1354).  After transport to BMC on January 5, 2018, she was alert without signs of acute distress, oriented to person, place, time, and situation with no focal neurological deficits, and cooperative with an appropriate mood and affect (A.R. at 1598).

The record of Plaintiff's January 26, 2018, visit to Dr. Krauskopf indicated that Plaintiff appeared well, was easy to engage, made good eye contact, and was anxious (A.R. at 1356). During her April 13, 2018 visit to Dr. Krauskopf, Plaintiff reported that her depression was up and down and she was anxious about losing weight (A.R. at 1543).  Dr. Krauskopf noted that Plaintiff was easy to engage, made good eye contact, and was less anxious and brighter (A.R. at 1543).

On May 9, 2018, Plaintiff visited the BMC emergency department for a sore throat (A.R. at 1617, 1620). She was alert, oriented to person, place, time, and situation, cooperative and displayed an appropriate mood and affect and normal judgment (A.R. at 1619). When Plaintiff returned to the emergency department on May 25th (A.R. at 1639), she was alert, oriented to person, place, time, and situation, cooperative, and her speech was normal (A.R. at 1641). On September 4, 2018, Plaintiff visited Baystate Neurology for treatment of migraine headaches (A.R. at 1670). The record noted her pleasant affect (A.R. at 1671). She was alert, oriented x 3, with intact commands and fluent speech (A.R. at 1671).

       C.     <u>Opinion Evidence</u>

          1.     Consultant Ananda Hernandez-Rivera, Psy.D.

On July 25, 2017, psychological consultant Ananda Hernandez-Rivera conducted a psycho-diagnostic interview of Plaintiff and reviewed related records (A.R. at 1263). Plaintiff reported that she had suffered from depression and anxiety for a very long time and described her symptoms (A.R. at 1263, 1266). She told Dr. Hernandez-Rivera that the father of her two oldest children shot her twice in the face when she was fifteen and she had remained in a coma for eight days (A.R. at 1263). She also indicated that she was sexually abused when she was very young (A.R. at 1263, 1266). Plaintiff reported that she was hospitalized two or three times for depression and suicidal ideation or attempts when she lived in Puerto Rico (A.R. at 1263).

As to Plaintiff's mental status, Dr. Hernandez-Rivera noted that Plaintiff was cooperative and engaged in the interview, but was noticeably anxious, uncomfortable, and tense. Dr. Hernandez-Rivera observed psychomotor agitation and fidgeting. There were no indicia of malingering or factitious behavior. Plaintiff had difficulty recalling specific dates and time frames but was able to provide adequate answers to most questions (A.R. at 1264). Plaintiff

indicated that her mood was down most of the time.  Dr. Hernandez-Rivera noted that Plaintiff's affect was consistent with her expressed mood.  Her tone of voice was low, her eye contact was poor, and she appeared tired and tense.  Plaintiff's thought process was goal directed and she was oriented x 3.  Plaintiff displayed adequate judgment.  As to her memory, Plaintiff reported that she forgot appointments, conversations, and names.  She used a calendar to remember everything.  On the measure of remote memory, Plaintiff recalled one of the three past presidents.  On the measure of recent memory, she recalled one of three objects.  On the measure of immediate memory, Plaintiff repeated two of three digits forward and all three digits backward.  As to concentration, test results demonstrated Plaintiff's lack of proficiency using numbers and math.  She was able to spell "mundo" ("world" in Spanish) forward and backward and was able to successfully follow a three-step command by picking up an object with her left hand, passing it to her right hand, and putting it on the floor (A.R. at 1265).

Dr. Hernandez-Rivera assessed Plaintiff as able to reason and understand based upon her ability to follow instructions and provide appropriate answers during the interview.  Based on the brief memory and concentration tasks that Plaintiff performed, Dr. Hernandez stated that Plaintiff's remote, recent, and immediate memory and sustained concentration were limited.  According to Dr. Hernandez-Rivera, Plaintiff had problems with concentration and focusing on tasks, as well as with the ability to retain and recall information.  Dr. Hernandez-Rivera noted that these limitations were consistent with a person suffering from depression and anxiety (A.R. at 1266).

Dr. Hernandez-Rivera diagnosed Plaintiff with Post-Traumatic Stress Disorder (PTSD), and major depressive disorder, recurrent, moderate (A.R. at 1266).  She indicated that Plaintiff's mental health prognosis was guarded because, notwithstanding mental health therapy and

14

psychotropic medications, she suffered from depression and anxiety symptoms, including memory and language deficits, flashbacks, nightmares, and isolation, that were associated with unresolved past trauma.  According to Dr. Hernandez-Rivera, Plaintiff's depression and anxiety symptoms were exacerbated by her medical and physical limitations and lack of adequate resources (A.R. at 1266, 1267).

        2.     State Agency Assessments

        *a.*     *DIB and SSI - Initial*

On July 26, 2017, Jane Metcalf, Ph.D., completed a disability assessment of Plaintiff's mental health impairments for purposes of her DIB and SSI claims (A.R. at 238, 252).  Based on the record, which included Dr. Hernandez-Rivera's report, Dr. Metcalf concluded that Plaintiff had severe trauma and stressor-related disorders and severe depressive, bipolar, and related disorders (A.R. at 231, 238, 245, 252).  In her opinion, those conditions caused a moderate impairment of Plaintiff's ability to understand, remember, and apply information; a mild impairment in her ability to interact with others; a moderate impairment in her ability to concentrate, persist, or maintain pace; and a moderate impairment in her ability to adapt or manage herself (A.R. at 238, 252).  In the mental residual functional capacity assessment, Dr. Metcalf found that Plaintiff had understanding and memory limitations (A.R. at 239, 253).  Based on the results of Dr. Hernandez-Rivera's mental status examinations, Dr. Metcalf opined that Plaintiff could understand and carry out simple instructions but would have difficulty retaining information for complex instructions (A.R. at 239-40, 253-54).  Dr. Metcalf found that Plaintiff was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods (A.R. at 239-41, 253-54).  Although Plaintiff had moderate limitations in her ability to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace, she was able to sustain focus and pace for simple tasks for two-hour periods during an eight-hour day in a forty hour workweek (A.R. at 240, 254).  Dr. Metcalf further opined that Plaintiff had moderate limitations in her ability to interact with the general public, but otherwise had no limitations on social interaction (A.R. at 240-41, 254-55).  Plaintiff was moderately limited in her ability to respond appropriately to the stress of changes in the work setting, but could manage minor changes (A.R. at 241, 255).  Dr. Metcalf concluded that Plaintiff was not disabled (A.R. at 241, 242, 255, 256).

<em>b.     DIB and SSI – Reconsideration</em>

On September 12, 2017, on reconsideration, Kenneth Higgins, Ph.D., agreed with Dr. Metcalf that Plaintiff had severe trauma and stress related disorders and severe depressive, bipolar, and related disorders (A.R. at 267-68, 281-82).  As did Dr. Metcalf, Dr. Higgins concluded that Plaintiff's impairments caused moderate limitations in Plaintiff's ability to understand, remember, and apply information, concentrate, persist, or maintain pace, and adapt or manage herself.  Unlike Dr. Metcalf, Dr. Higgins opined that Plaintiff had moderate limitations in her ability to interact with others (A.R. at 267, 281).  Notwithstanding that difference, Dr. Higgins agreed with Dr. Metcalf's mental residual functional capacity assessment and that Plaintiff was not disabled (A.R. at 269-72, 283-86).

D.     <u>Testimony at the September 19, 2018 Hearing</u>

At the September 2018 hearing, Plaintiff told the ALJ about the gunshot wounds to her head and neck in 1994 that caused headaches and limited vision in her right eye (A.R. at 216).  She was receiving treatment for depression (A.R. at 217).  She visited a psychiatrist for medication management once a month and saw a psychologist for therapy twice a month (A.R. at

16

217).  Her mood was fine and calm on some days, but she cried at other times (A.R. at 223).  She

had not been hospitalized for mental health issues in the past two or three years (A.R. at 217).

Plaintiff testified that she was always anxious (A.R. at 222).  Her anxiety increased when

she was in physical pain, frustrated over her inability to do things, or was around people (A.R. at

222).  Although she feared that people would hurt her when she left her home, she went on a

cruise with her son in February 2018 (A.R. at 218, 222).  She took medication and used a therapy

dog to relieve her anxiety (A.R. at 222).  She reported difficulty concentrating and focusing

(A.R. at 222).  She needed her son and a medication planner to remind her to take her medication

(A.R. at 222-23).

      E.    <u>The ALJ's Favorable November 30, 2018 Decision</u>

The ALJ found that Plaintiff had the following severe impairments:  keratoconus; a

history of corneal transplant times three; low back pain; osteoarthritis; bilateral knee impairment,

right worse than left, with history of surgery; asthma; fibromyalgia; obesity; migraine headaches;

PTSD; depression; conversion disorder; history of pseudoseizures; an OB/GYN/gastrointestinal

procedure on August 7, 2018; and a history of a gunshot wound in 1994 (A.R. at 300).  Plaintiff

did not have an impairment or combination of impairments that met or medically equaled the

severity of a listed impairment (A.R. at 305).  As to Plaintiff's mental health status, the ALJ

found that she had a moderate limitation in her ability to understand, remember, or apply

information and to interact with others; a marked limitation in her ability to concentrate, persist,

or maintain pace; and a moderate limitation in adapting or managing herself.  The ALJ noted and

relied on a lengthy psychiatric history that included multiple suicide attempts and inpatient

treatment (A.R. at 308).

In crafting the RFC, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms and that Plaintiff's subjective complaints were fully consistent with the medical and the other record evidence (A.R. at 306-07).  He found that Plaintiff had the RFC to perform light work except that she was limited to simple, routine tasks and no more than occasional co-worker and public contact and, critically, would be off task at least twenty-five percent of the workday due to chronic pain and psychiatric symptoms (A.R. at 306).  The ALJ concluded that Plaintiff's impairments were so severe as to preclude performance of all substantial gainful activity and that she had been disabled since July 1, 2013 (A.R. at 307-08, 309).

      F.    <u>The Appeals Council's Remand</u>

The Appeals Council remanded the case on the grounds that the ALJ had not provided a sufficient rationale for his finding that Plaintiff would be off-task for twenty-five percent of each day or pointed to substantial evidence to support the finding (A.R. at 314).  The Appeals Council was also critical of the ALJ's related finding that there was a marked limitation in Plaintiff's ability to maintain concentration, persistence, and pace (A.R. at 314-15).  The ALJ's reliance on Plaintiff's lengthy psychiatric history, including suicide attempts and inpatient treatment, was insufficient where Plaintiff's last suicide attempt was more than ten years before the alleged onset of her disability and psychiatric treatment, alone, was insufficient to justify a marked impairment (A.R. at 314).

On remand, the Appeals Council directed the ALJ to:

- Obtain additional evidence concerning [Plaintiff's] mental and physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence. . . .

- As warranted, obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from [Plaintiff's] impairments . . . .

- Give further consideration to [Plaintiff's] maximum [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations . . . .   In so doing, evaluate the treating, nontreating, and nonexamining source opinions . . . and explain the weight given to such opinion evidence . . . .

- If warranted by the expanded record, obtain supplemental evidence from a [VE] to clarify the effect of the assessed limitations on [Plaintiff's] occupational base . . . .

(A.R. at 316).  The Appeals Council further instructed the ALJ to offer Plaintiff an opportunity for a hearing before issuing a new decision (A.R. at 316).

  G. <u>Records Submitted After Remand</u>

    1. School Street Counseling Institute

Plaintiff visited Dr. Casals on July 2, 2019, after she was discharged from Baystate Medical Center where she was treated for depression with suicidal ideation after separating from her significant other because of his infidelity.  Plaintiff reported that her hospital treatment was very beneficial (A.R. at 1885).  Dr. Casals added the diagnosis of bulimia to his prior diagnosis of major depressive disorder, recurrent, moderate, and continued her medications (A.R. at 1884, 1886).  Plaintiff remained engaged in psychotherapy (A.R. at 1886).

Plaintiff reported ongoing anxiety, rumination, and irritability caused by multiple stressors when she visited Dr. Casals on September 5, 2019.  She was still sad about the recent break up with her former partner but was looking forward to becoming a grandmother and considering moving to Florida or Puerto Rico where she would have more support (A.R. at 1881, 1885).  As to her mental status, she was calm and cooperative.  Her speech was normal, and she made good eye contact.  She reported that her mood was so so.  Her affect was reactive.  Her thought process was linear, coherent, and goal oriented and her thought content was appropriate for context.  She denied suicidal or homicidal ideation, delusions or other psychotic content, and

perceptual disturbances.  Her insight was fair, and her judgment and impulse control were good (A.R. at 1883).  Dr. Casals maintained her medication regimen and directed her not to skip doses (A.R. at 1881, 1885).

Plaintiff reported increased anxiety, frustration, and distractions due to social and medical stressors during her medication management visit with Dr. Casals on October 22, 2019 (A.R. at 1871, 1875).  She was still grieving the end of her relationship with her former partner and was traveling to Florida to retrieve her belongings from him (A.R. at 1871, 1875).  She reported binging and purging episodes (A.R. at 1871).  The results of her mental status examination were consistent with those of her visit in September (A.R. at 1873).  Dr. Casals did not change her medication (A.R. at 1875).

On November 26, 2019, Plaintiff reported improvement in her mood and a reduction in anxiety (A.R. at 1964, 1965).  She described her mood as ok.  Dr. Casals noted that her affect was full range and reactive.  Her mental status was otherwise consistent with her September and October evaluations (A.R. at 1967).  She was keeping busy at home and had a good relationship with her daughter (A.R. at 1965).  She denied suicidal ideation (A.R. at 1964, 1965).  Dr. Casals continued her current medications and doses (A.R. at 1964).

2.     Worthington Clinic, Baystate Medical Center Emergency
Department and Baystate Neurology

On October 5, 2018, Plaintiff's PHQ-9 score of 19 indicated moderately severe depression (A.R. at 1862).  She told Dr. Krauskopf that she was always crying and felt like the world was going to come down on her, but the medication and regular therapy sessions were helping (A.R. at 1863).  Dr. Krauskopf reported that Plaintiff was alert, oriented x 3, easy to engage, made good eye contact, spoke clearly, but was dysthymic and tearful when discussing her mood symptoms (A.R. at 1864).  During Plaintiff's October 17 and 26, 2018 visits to Dr.

20

Krauskopf, she was alert with appropriate affect and clear speech, oriented x 3, easy to engage, and made good eye contact (A.R. at 1855, 1858).  On February 8, 2019, Plaintiff reported that her anxiety had improved and, overall, her mental condition was stable with the medication (A.R. at 1852).  Dr. Krauskopf noted that Plaintiff was easy to engage and made good eye contact (A.R. at 1852).

Plaintiff visited the BMC emergency department on February 17, 2019 complaining of acute pain (A.R. at 1776, 1778).  She was alert, oriented x 4, and cooperative (A.R. at 1776).  Plaintiff returned to the emergency department on March 19, 2019 after she suffered seizures and arm pain from an automobile accident (A.R. at 1749).  She did not manifest symptoms of anxiety or depression and was alert, oriented to person, place, time, and situation, with normal speech and an appropriate mood and affect (A.R. at 1750, 1752).

The record of Plaintiff's March 22, 2019, visit to the Worthington Clinic showed a PHQ-9 score of 10, indicating a mild to moderate level of depression.  Plaintiff reported a normal mood (A.R. at 1849).  She was easy to engage and made good eye contact (A.R. at 1849).  On May 3, 2019, Plaintiff reported that her daughter was living with her, and she had a "new partner" (A.R. at 1844).

On June 21, 2019, Plaintiff was transported to the BMC emergency department after reporting suicidal ideation with a plan (A.R. at 1916, 1917).  She was in mild distress and tearful but was alert to person, place, time, and situation, and was cooperative (A.R. at 1904).  Plaintiff was admitted to BMC for inpatient treatment (A.R. at 1894, 1895).  She reported that after she argued with her significant other over his relationship with another woman three days prior to her admission, she stopped drinking and eating and slept only when she took Ambien (A.R. at 1891, 1896).  She said she felt she was an obstacle to her children because of her mental health

struggles, and she reported hypervigilance, intrusive thoughts of trauma through flashbacks, and nightmares, anger, hopelessness, and a distorted voice telling her to hang herself (A.R. at 1890, 1891).  Her mental status examination showed a blunted, congruent affect and quiet speech that was difficult to understand (A.R. at 1893).  She was oriented to person, time, and place and her memory was grossly intact (A.R. at 1893).  Her judgment was not clear and her insight was poor (A.R. at 1893).  Her thought process was linear, tangential, ruminating, without a flight of ideas, and with loose associations, perseveration, and some thought blocking (A.R. at 1893).  Plaintiff was diagnosed with major depressive disorder with suicidal ideation, rule out schizophrenia versus unspecified psychosis (A.R. at 1894).

Plaintiff was discharged from BMC on July 2, 2019 (A.R. at 1896).  Her mental status examination showed that she was pleasant, cooperative, calm, and made good eye contact.  She reported feeling good.  Her affect was euthymic and congruent with her mood.  Her speech was clear with appropriate inflection, good articulation, and normal rate and tone.  Her memory was grossly intact.  She was oriented x 3 and denied auditory or visual hallucinations and suicidal or homicidal ideation (A.R. at 1899).  Her thought process was linear and goal-oriented, and she displayed good insight and judgment (A.R. at 1899).  Her diagnosis was major depressive disorder, recurrent, severe, with psychotic features, PTSD, and an eating disorder NOS (1897-98).

On July 12, 2019, Plaintiff told Dr. Krauskopf that her depression had improved since her hospitalization (A.R. at 1841).  On August 16 and September 27, 2019, Plaintiff was alert, oriented x 3, spoke softly, and was tearful when she described her low mood to Dr. Krauskopf (A.R. at 1835, 1838).

On December 18, 2019, Carol Zimmerman, N.P. of Baystate Neurology noted that Plaintiff was alert, oriented x 3, had a good fund of knowledge, followed commands well, and answered questions appropriately (A.R. at 2030, 2032).

When Plaintiff visited BMC's emergency department for abdominal pain on December 31, 2019 and January 13, 2020 (A.R. at 2095, 2116), she was alert, oriented to person, place, time, and situation, and cooperative (A.R. at 2100, 2118).  Her mood and affect were normal on December 31st (A.R. at 2095, 2100).  She was anxious on January 13th (A.R. at 2118).  Plaintiff presented in the emergency department again on January 17, 2020 (A.R. at 2049, 2058, 2062). Although she was tearful and in mild distress, she cooperated with hospital personnel, was oriented to person, place, time, and situation, gave appropriate answers to questions, and followed all commands (A.R. at 2051).

H.     Second Hearing on April 2, 2020

Plaintiff told the ALJ that she had a driver's license but did not have a car, still lived with her son, and was able to watch television (A.R. at 183-84).  She was prescribed medication to treat depression, still attended therapy sessions twice a month, and was hospitalized for severe depression in June 2019 (A.R. at 187).  She had difficulty sleeping for more than four or five hours a night even with medication (A.R. at 191-92).  Her anxiety prevented her from being near too many people and sometimes she had difficulty concentrating and maintaining focus.  She still needed reminders to take medication and attend appointments (A.R. at 192).

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience who was limited to performing light work that was simple and routine in nature and that required no more than occasional coworker or public contact (A.R. at 195-96). The VE testified that the hypothetical individual could not perform Plaintiff's past work, but

23

could work as an electrical assembler, DOT 729.687-010, with about 9,300 jobs in the national

economy; a hand packager, inspector, DOT 559.687-074, with approximately 3,600 jobs in the

national economy; and a price marker, DOT 209.587-034, with 124,000 jobs in the national

economy (A.R. at 196-97).  The VE opined that there would be no work available for an

individual who was off-task during twenty-five percent of the workday due to chronic pain and

psychiatric symptoms or who was absent from work more than one day per month (A.R. at 197-

98).

I.      The ALJ's Decision After Remand

The ALJ conducted the requisite five-step sequential analysis.  He found that Plaintiff's

date last insured was December 31, 2019, and that, although Plaintiff had worked, she had not

engaged in substantial gainful activity after the alleged onset date of July 1, 2013 (A.R. at 70).

At the second step, he found that Plaintiff's severe impairments included PTSD and depressive

disorder (A.R. at 70-71).  Plaintiff did not have an impairment or combination of impairments

that met or medically equaled the severity of a listed impairment (A.R. at 71-75).  As to the so-

called Paragraph B criteria, the ALJ found that Plaintiff had a mild limitation in her ability to

understand, remember, or apply information; a moderate limitation in interacting with others; a

moderate limitation in her ability to concentrate, persist, or maintain pace; and a mild limitation

in adapting or managing herself (A.R. at 73-74).

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably

be expected to cause the alleged symptoms, but Plaintiff's statements concerning the intensity,

persistence, and limiting effects of those symptoms were not entirely consistent with the medical

evidence and other evidence in the record (A.R. at 78).  The ALJ found that Plaintiff had the

RFC to perform light work except that she was limited to work that was simple and routine in

nature and that required only occasional coworker or public contact (A.R. at 75). The ALJ determined that Plaintiff was unable to perform her past relevant work, but could perform the unskilled jobs of electrical assembler, hand packager, and price marker identified by the VE and, therefore, was not disabled from July 1, 2013 through June 2, 2020, the date of the decision (A.R. at 103-04).

IV.   ANALYSIS

In the ALJ's November 2018 favorable decision, he found that Plaintiff had marked limitations in the Paragraph B criteria of concentration, persistence, or pace and determined that she had the RFC to perform light work except that she was further limited to simple, routine tasks with only occasional co-worker and public contact (A.R. at 306). The ALJ further determined that Plaintiff would be off-task for at least twenty-five percent of the workday due to chronic pain and psychiatric symptoms, and, consequently, could not perform either her past work or any job available in the national economy (A.R. at 306-09). In June 2020, after remand, the ALJ found that Plaintiff had a moderate rather than a marked limitation in concentration, persistence, or pace and could perform light work involving simple, routine tasks with only occasional co-worker and public contact. The ALJ did not find that Plaintiff would be off-task for twenty-five percent of each work day (A.R. at 74, 75). The ALJ concluded that Plaintiff was not disabled (A.R. at 103-04). Plaintiff argues that the ALJ erred by treating the opinion evidence inconsistently in his first and second decisions and seeks a remand to clarify why he gave Dr. Hernandez-Rivera's opinion great weight in his first opinion and significant weight in the second (Dkt. No. 16 at 9-11, 13-14). Plaintiff also appears to argue that the RFC in the second decision was not supported by substantial evidence (Dkt. No. 16 at 10, 12-14). The Commissioner disputes Plaintiff's contention that the ALJ erred (Dkt. No. 9-16).

25

    A.    <u>The ALJ was not bound by his findings in his first decision</u>.

"On remand, an ALJ 'shall take any action that is ordered by the Appeals Council and may take additional action that is not inconsistent with the Appeals Council's order.'" *Cook v. Berryhill*, CIVIL ACTION NO. 14-40112-DHH, 2017 WL 1135221, at *11 (D. Mass. Mar. 27, 2017) (quoting 20 C.F.R. § 404.977(b)). "'An ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates that decision and remands the matter for further proceedings.'" *Dacosta v. Berryhill*, Case No. 3:17-cv-30085-KAR, 2019 WL 404039, at *11 (D. Mass. Jan. 31, 2019) (quoting *Kearney v. Colvin*, 14 F. Supp. 3d 943, 949 (S.D. Ohio 2014)).  Furthermore, "[a]n ALJ tasked with deciding a remanded claim is not bound by prior conclusions or findings if those conclusions or findings have not been adopted by the Appeals Council." *Id.*  The Appeals Council did not adopt the ALJ's November 2018 conclusions or findings in the instant case (A.R. at 313-17).  Instead, the Appeals Council directed the ALJ to obtain additional evidence of Plaintiff's mental and physical impairments, re-evaluate her RFC in light of the record evidence, identify the evidence that supported his conclusions about her limitations, evaluate the opinion evidence in accordance with the regulations and explain the weight he assigned it, offer Plaintiff a second hearing, and issue a new decision (A.R. at 316).  The ALJ complied with that order.

That the ALJ may have reevaluated the weight he assigned to Dr. Hernandez-Rivera's opinion after the remand by the Appeals Council is not an error.  *See Boardway v. Berryhill,* Case No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *16 (D. Mass. Sept. 10, 2018) (on remand, the ALJ was not bound by the prior assessment of a physician's opinion) (citing 20 C.F.R. § 404.955(a)); *Correia v. Berryhill,* Case No. 3:16-cv-30153-KAR, 2017 WL 4365987, at *11 (D. Mass. Sept. 29, 2017) ("There is nothing in the Appeals Council's remand order that precluded

the ALJ from assigning a different weight to the opinion of [the DDS mental health reviewer] on reconsideration."); *Cook*, 2017 WL 1135221, at \*11 (on remand, the ALJ was free to reevaluate opinions from medical sources as he saw fit, as long as the reevaluation was consistent with the Appeals Council's remand order).

Moreover, it is far from clear that the ALJ's slight adjustment in his assessment of Dr. Hernandez-Rivera's opinion evidence had much, if any, effect on the ALJ's decision after remand. On remand, the ALJ carefully considered the contents of Dr. Hernandez-Rivera's report, characterizing it as well-documented and well-reasoned and continuing to treat the opinion as important in his assessment of Plaintiff's functional limitations. He found that Dr. Hernandez-Rivera's assessment of Plaintiff's limitations indicated that Plaintiff could function at the level indicated in the RFC he crafted (A.R. 96). The change in the outcome was dictated principally by the ALJ's painstaking review of all of the medical evidence of record. As to Plaintiff's mental health impairments, that evidence, he found, confirmed a history of post-traumatic stress disorder and depressive disorder but did not show the type of significant abnormalities that one would expect if Plaintiff were disabled by mental health impairments from performing all manner of work (A.R. 93).

B.  The RFC was supported by substantial evidence.

To the extent Plaintiff mounts an independent argument that the RFC was not supported by substantial evidence – and it is not clear that she does so – any such argument also fails. *Cf. Debaker v. Comm'r of U.S. Soc. Sec. Admin.*, Civil No. 19-cv-107-JL, 2019 WL 4027542, at \*2 (D.N.H. Aug. 27, 2019) ("'[A] litigant has an obligation "to spell out its arguments squarely and distinctly," or else forever hold its peace.'") (quoting *Rivera–Gomez v. de Castro*, 843 F.2d 631, 635 (1st Cir. 1988)).

The ALJ accepted Dr. Hernandez-Rivera's diagnoses of PTSD and major depressive disorder, recurrent, moderate and gave her opinions significant weight (A.R. at 95).  Dr. Hernandez-Rivera did not opine that Plaintiff was disabled or unable to work (A.R. at 1263-67). She conducted a mental status examination including memory and concentration tasks to measure Plaintiff's ability to focus and remember rather than relying exclusively on Plaintiff's subjective reports of her symptoms (A.R. at 95, 96, 1266).  *See Andrews v. Kijakazi,* CIVIL ACTION NO. 18-40069-TSH, 2022 WL 867803, at *3 (D. Mass. Mar. 23, 2022) (the consultant's performance of a mini-mental status examination as opposed to Plaintiff's subjective statements supported the ALJ's assignment of significant weight to her opinion); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).  Dr. Hernandez-Rivera's opinions about Plaintiff's abilities to remember, concentrate, and interact with others were consistent with treatment records from providers and other record evidence.  *See Abubakar v. Astrue,* Civil Action No. 1:11-cv-10456-DJC, 2012 WL 957623, at *11-12 (D. Mass. Mar. 21, 2012) (comparing the non-treating physician's opinion to the majority of the medical evidence and the plaintiff's testimony to determine whether or not the weight the ALJ assigned to the opinion was supported by the evidence); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).

The ALJ accorded the opinions of the nonexamining state agency consultants "some, but not great weight" because they evaluated the record comparatively early in the process.  The ALJ nonetheless incorporated their assessments of Plaintiff's capacity to remember, concentrate, and interact with coworkers and the general public (A.R. at 75, 102-03), which were based in part on Dr. Hernandez-Rivera's opinions (A.R. at 231, 236, 241, 245, 250, 255, 263, 270-71, 277, 285). The state agency consultants noted that, according to Dr. Hernandez-Rivera, Plaintiff had obtained a GED, trained as a paramedic and an emergency room and operating room technician,

and worked as a security guard for four years, indicating that she had the capacity to understand and carry out simple instructions (A.R. at 236, 239-41, 250, 253-55, 270-71, 283-84).  The state agency consultants further concluded that Plaintiff "would do better in [a] setting with occasional demands for interaction [with others]" (A.R. at 241, 254-55, 270-71, 285), and this limitation was reflected in the RFC.

Records from Plaintiff's treating care providers supported the ALJ's conclusion about the extent of Plaintiff's functional limitations attributable to Plaintiff's diagnosed mental health impairments.  Mental status examination results showed that Plaintiff's perception, thought content and process, intellectual functioning, orientation, memory, insight, and judgment were generally within normal limits even when she described multiple stressors and manifested a depressed or anxious mood and affect (A.R. at 99-101, 1401, 1403, 1490-91, 1503-04, 1507, 1509, 1511, 1516, 1518, 1520, 1525, 1554, 1556, 1558, 1560, 1562, 1567, 1871, 1873, 1875, 1883, 1885, 1965, 1967).  Notes made by Dr. Krauskopf, Plaintiff's PCP, were consistent with the mental status examination results (A.R. at 1341, 1347, 1349, 1352, 1356, 1543, 1849, 1852, 1855, 1858, 1862, 1864).  Plaintiff told Dr. Krauskopf that her symptoms of depression had improved after her psychiatric hospitalization in June 2019 (A.R. at 1841).

Except for the records of Plaintiff's June 2019 psychiatric hospitalization, which appeared situational rather than systemic (A.R. at  97-98, 1891, 1896), the records of Plaintiff's visits to the BMC emergency department from August 2016 through January 2020 showed that Plaintiff was co-operative, alert, oriented to person, place, time, and situation and manifested an appropriate affect, mood, and judgment (A.R. at 1052-53, 1098, 1099, 1598, 1619, 1641, 1750, 1752, 1776, 2051, 2095, 2100, 2118).  As to June 2019, Plaintiff reported feeling good when she was discharged from BMC after her hospitalization, told Dr. Casals that her hospitalization had

been very beneficial, and reported improvement in her depressive symptoms to Dr. Krauskopf about ten days after her discharge.  Dr. Casals did not change her medications or her dosages after the hospitalization (A.R. 98, 1841, 1875, 1885-86, 1899, 1964).

The ALJ also was entitled to rely on Plaintiff's statements about her activities and functional limitations.  In January 2017, Plaintiff indicated that she finished what she started, did not have difficulty concentrating, could follow written instructions in Spanish, and was able to remember and follow verbal instructions when they were communicated (A.R. at 640).  She attended church (A.R. at 664) and traveled to Puerto Rico in 2017 and 2018 and to Florida in 2019 (A.R. at 76, 99, 101, 1405-06, 1499, 1516, 1520, 1552, 1556, 1871, 1875, 1965).  At the April 2, 2020 hearing, Plaintiff testified that her difficulty concentrating and maintaining focus was not persistent (A.R. at 192).

The opinions of Dr. Hernandez-Rivera and the state agency consultants concerning Plaintiff's functional limitations attributable to her mental health impairments were consistent with each other and supported by the record.  To the extent there was contradictory evidence in the record, it was up to the ALJ to resolve any such contradictions.  *See, e.g., Applebee*, 744 F. App'x at 6.  Where substantial evidence supports the ALJ's conclusion that "the record reflected some limitations due to [Plaintiff's] impairments . . . [but] she retained the ability, despite her impairments, to perform work activities within the [stated RFC]" (A.R. at 103), there is no basis for remand.

V.   CONCLUSION

Based on the foregoing, Plaintiff's motion for judgment on the pleadings (Dkt. No. 15) is DENIED and the Commissioner's motion to affirm (Dkt. No. 21) is GRANTED.  The clerk is directed to close the case.

It is so ordered.

Date:  September 13, 2022                         /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 U.S. MAGISTRATE JUDGE